UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| STEVEN GNASSI,<br><br>                      Plaintiff,<br><br>      v.<br><br>CARLOS DEL TORO, Secretary of the Navy,<br><br>                      Defendant. | CASE NO. 3:20-cv-06095-JHC<br><br>FINDINGS OF FACT & CONCLUSIONS OF LAW |

## I

### INTRODUCTION

This matter was tried before the Court without a jury from October 24 to November 2, 2022.  Having heard the testimony at trial, considered the admitted trial exhibits, and reviewed the parties' briefing, the Court makes the following findings of fact and conclusions of law under Federal Rule of Civil Procedure 52(a).  The findings and conclusions below are based on the Court's consideration of the admissible evidence and assessment of the credibility of the trial witnesses.[1]

---

[1] To the extent any findings of fact may be deemed conclusions of law, or vice-versa, the label the Court uses does not control. *See In re Bubble Up Delaware, Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982). And indeed, to avoid undue repetition, certain findings of fact appear in the Court's conclusions of law.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## II

### BACKGROUND

1.      This matter arises out of the United States Navy's non-selection of Plaintiff

Steven Gnassi for its 2019 Apprentice Program at the Puget Sound Naval Shipyard and

Intermediate Maintenance Facility (Shipyard) in Bremerton, Washington.

2.      Plaintiff sued the Navy under the Age Discrimination in Employment Act

(ADEA), 29 U.S.C. § 621 *et seq.*  Plaintiff seeks damages and injunctive relief.

3.      In 2019, Plaintiff submitted applications for 12 Apprentice Program positions.

Before trial, the Court granted the Navy partial summary judgment, i.e., with respect to the

positions the Navy denied Plaintiff without interviewing him.  Dkt. # 53.  The trial concerned the

two Apprentice Program positions for which Plaintiff was interviewed: a sheet metal mechanic

apprenticeship and an electroplater apprenticeship.

## III

### FINDINGS OF FACT

4.      Plaintiff was born in 1954.  He holds a Bachelor of Science degree in Biology.

He served in the Navy between 1978 and 2009, retiring as a captain.  Since 2016, Plaintiff has

been employed by the Navy at the Shipyard.  When he applied to the Apprentice Program in

2019, he was around 65 years old.

5.      Carlos Del Toro, the Secretary of the Navy, is the sole Defendant.  At all relevant

times, the Secretary of the Navy has been Plaintiff's employer.

6.      In 2016, when Plaintiff began his employment at the Shipyard, he first worked as

a Ship Inactivation and Dismantling Helper Trainee, a wage grade 1 (WG-1) position.  After

completing the trainee program, Plaintiff worked as a Ship Inactivation and Dismantling Worker,

a WG-5 position.  This role involved dismantling and recycling materials from inactivated

nuclear-powered submarines.  Plaintiff held two other WG-5 positions before applying for the Apprentice Program in 2019: Quality Control & Hull Accountability Tracking System Coordinator and Property Utilization Coordinator.  Between 2016 and 2019, Plaintiff received positive performance ratings, performance-based awards, and miscellaneous bonuses.  Plaintiff has no disciplinary history at the Shipyard.

7.      The Shipyard offers a four-year Apprentice Program, including on-the-job skills training and college coursework, to train its trades-focused employees.  Shipyard managers describe its Apprentice Program as one of the best opportunities for career advancement within the Shipyard.  The Shipyard is divided into numbered "Shops" or "Codes."[2]  These teams specialize in one or more trades, such as pipefitting or electroplating.  Apprentices are hosted by individual Shops.

8.      Plaintiff submitted applications for the Apprentice Program in 2017, 2018, and 2019.  In 2017 and 2018, he was interviewed but not selected as an apprentice.  In 2019, the Shipyard accepted applications for its Apprentice Program via USAJobs.gov, an online application portal for federal government employment.  USAJobs.gov required Apprentice Program applicants to submit their résumés and standardized test scores.  Applicants who timely completed their online applications and had qualifying test scores appeared on a list of qualified candidates distributed to Shop managers.

9.      Applicants could submit scores from either the "Next Generation" or "ACCUPLACER" standardized tests.  For Next Generation, the test Plaintiff and most candidates took, each section of the test had 300 available points.[3]  The Shipyard required certain

---

[2] The Court refers to both as "Shops."
[3] The Court's consideration of test scores concerns scores from the Next Generation test.

minimum scores: 260 for reading, 260 for writing, and 275 for math.  Plaintiff scored 284 for reading, 271 for writing, and 300 for math.

10.     In 2019, Plaintiff submitted his online application, including his résumé and qualifying test scores.  Plaintiff was interviewed for the sheet metal mechanic apprenticeship in Shop 17 and the electroplater apprenticeship in Shop 31.  He interviewed with Shop 17 managers in May 2019 and with Shop 31 managers in July 2019.  On July 24, 2019, Plaintiff received an email that he had not been selected.  That year, every apprentice hired at the Shipyard was more than a decade younger than Plaintiff.

11.     The interview notes taken during Plaintiff's Shop 17 and 31 interviews are missing.  The Shipyard employees who conducted Plaintiff's interviews were unaware of any rule requiring the preservation of handwritten interview notes taken during apprenticeship interviews.  An interviewer's notes usually consisted of only a candidate's answers to questions posed during the interview and a numerical rating.

## A.     Shop 17 Interview

12.     Shop 17 managers Darrell Schneider, Mark Malley, and Kent Burton conducted Plaintiff's interview.  All three testified at trial.

13.     Schneider said he does not recall interviewing Plaintiff in 2019.  He testified that if Plaintiff's behavior or statements during the interview had been noteworthy, he would have been more likely to remember the interview.

14.     Malley testified as follows: Plaintiff's demeanor was "petulant" during the interview and answered questions as if he were "in trouble as a child."  But Malley could not remember any specific answers that Plaintiff gave.  At one point, Malley asked Plaintiff to read a statement out loud, a routine procedure to gauge reading skills.  After reading the statement, Plaintiff slid the piece of paper back to the panelists "aggressively."  On these points, the Court

finds Malley's testimony is less credible than Plaintiff's as there was no corroborating evidence (e.g., testimony by Schneider or Burton) that Plaintiff slid the paper "aggressively" or that Plaintiff exhibited a "petulant" demeanor.  Malley also said that Plaintiff's responses to questions were "short" and "curt," which made Malley believe that Plaintiff was not interested in a Shop 17 apprenticeship.

15.     Burton testified that his criteria for evaluating candidates were attitude, potential for success, teamwork, and interest.

16.     Burton testified that he could not remember any specific answers that candidates gave in 2019, but that Plaintiff gave "short answers."  He said that during the interview, Plaintiff seemed uninterested in the Apprentice Program.  Burton also admitted that he remembered receiving a message expressing Plaintiff's interest to interview with Shop 17.  Burton testified that he remembered that Plaintiff's résumé listed more work experience than the average candidate's résumé; most candidates were recent high school graduates.  Plaintiff's counsel highlighted Burton's testimony in deposition that he believed an apprenticeship would be a "waste of [Plaintiff's] talents" because of the accomplishments listed on his résumé.

17.     Burton testified as follows: Plaintiff's demeanor was "arrogant" as Plaintiff responded to questions shortly after they were asked.  Burton was concerned that Plaintiff would not be "satisfied" as an apprentice, but that there was nothing Plaintiff said or did that created such an impression.  Burton was not concerned about Plaintiff's ability to excel at the academic part of the apprenticeship, his skills or his capacity to do the work, or about his discipline. Plaintiff's experience with carpentry and his familiarity with the Shipyard and its naval vessels would be helpful.  Burton's impression was that Plaintiff felt entitled to an apprenticeship based on his answers.  And Burton was concerned that Plaintiff would be "ostracized" because others

would not wish to work with him.  Plaintiff's "negative, entitled attitude" and his perceived inability to work with others were why Plaintiff was not selected.

18.     Having observed throughout the course of trial Plaintiff's demeanor, tone of voice, and other mannerisms that bear on one's belief in what any witness says, the Court finds Plaintiff's testimony to be credible about his Shop 17 interview.  Plaintiff testified as follows: he was interested in sheet metal work because of his three years of experience at the Shipyard reading blueprints and becoming familiar with the Shipyard's submarines and his experience in construction working with aluminum siding and roofing.  He was excited going into the interview.  He remembered the interviewers asking him questions about his attendance.  He believed they asked whether he would face difficulty with the apprenticeship's academic component, whether he could lift items of a certain weight and stand on his feet, and whether he was willing to travel.  His demeanor was professional, and he communicated all the information necessary to answer a given question.  The interviewers did not suggest in any way that they did not appreciate his answers or demeanor during the interview.

*Comparators*

19.     Shop 17 offered the sheet metal mechanic apprenticeship to Andrew Braun, Terrisita Dejesus, Jacqualyn Fair, Sara Gorton, Frank Hops, Nicholaus Roberts, and Jazmyn Smith.[4]

| Table 1 | | | |
|---|---|---|---|
| Name | Birth year | Approximate age in 2019 | Standardized test math score |
| Andrew Braun | 1989 | 30 | 286 |
| Terrisita Dejesus | 1999 | 20 | 279 |
| Jacqualyn Fair | 2000 | 19 | 276 |
| Sara Gorton | 1995 | 24 | 272 |
| Frank Hops | 1988 | 31 | 289 |

---

[4] The evidence includes the résumés of six out of the seven candidates Shop 17 selected in 2019; it does not include that of Jazmyn Smith.  Hops was the only employee who declined Shop 17's apprenticeship offer.

| Nicholaus Roberts | 1971 | 48 | 275 |
| Jazmyn Smith | 1993 | 26 | 286 |

20.     Braun had worked in the Shipyard for about three months when Shop 17 hired him.  Dejesus began working in the Shipyard in 2017, directly after high school graduation. While Burton stated during his deposition that he could not recall anything about her interview, he testified at trial that he remembered her positive attitude during the interview.  Fair worked at the Shipyard for around one year before being hired as an apprentice in 2019.  Before then, she was self-employed as a childcare worker.  Fair did not attend college.  Her high school GPA was 2.783, which Burton found concerning.  Gorton's math score of 272 did not meet the minimum score of 275.  Gorton was allowed to retake a different math test, on which she received a passing score.  At the time of her interview, Gorton had been working in the Shipyard for less than three months.  Hops had worked in the Shipyard for about one year when Shop 17 offered him an apprenticeship.  Roberts's math score was at the minimum of 275.

**B.    Shop 31 Interview**

21.     Shop 31 managers Tyler Jenkins, Mark Candaso, and William Bury conducted Plaintiff's interview.  Bury was deceased at the time of trial.  Candaso and Jenkins testified at trial.

22.     Jenkins testified as follows:  He learned in the interview that Plaintiff was a former naval captain and perceiving that Plaintiff's experience likely meant that he was smart, a good leader, and would take the apprenticeship seriously.  Plaintiff was engaged, attentive, and driven during the interview as Plaintiff described his 40 years of work experience and his continued desire to work for the government.

23.     Jenkins testified as follows:  His main concern was Plaintiff's answer to his question of what Plaintiff imagined his job would be in five years.  Plaintiff responded, "I will be

your boss." Because Jenkins had only recently become a supervisor three weeks prior, he was worried about supervising Plaintiff.

24.     Candaso testified that he found Plaintiff's attitude during the interview to be "obnoxious," as if he did not take the interview seriously. During a prior investigation, the Navy asked Candaso to draft a declaration identifying the reasons why he did not select Plaintiff as a Shop 31 apprentice. In that declaration, Candaso did not mention that he found Plaintiff to be obnoxious during the interview.

25.     Candaso testified that at one point, the interviewers asked Plaintiff if he had brought a copy of his résumé. He responded: "Are you kidding me? You don't have my résumé?" This interaction was corroborated by Jenkins. As for Plaintiff's answer to the question of what Plaintiff's job would be in five years, Candaso's recollection of the interaction differed a bit from that of Jenkins. Candaso remembered Plaintiff saying, "I see myself taking your job, taking your job, [and] taking your job," while pointing his finger at each interviewer. Jenkins did not remember Plaintiff pointing his finger at anyone.

26.     After evaluating Plaintiff's demeanor, appearance, and attitude on the witness stand and throughout trial, the Court finds that Plaintiff testified credibly about his Shop 31 interview. Plaintiff testified as follows: It seemed like the Shop 31 interviewers were unprepared for his interview, but his demeanor was professional and enthusiastic. Jenkins asked where Plaintiff saw himself in five years. Plaintiff said that he wanted to be Jenkins's boss. He gave that answer to convey his enthusiasm and his desire to complete the program and advance in the Shipyard. The panelists did not exhibit any kind of adverse reaction to his answer.

27.     As for the handwritten interview notes, Candaso and Jenkins testified that their notes did not contain information about age or physical attributes. Jenkins said he discarded his notes a day or two after deciding not to select Plaintiff. Candaso testified that he kept interview

notes in a filing cabinet located in his office.  Candaso has since switched positions and moved offices.  Candaso could not recall when he was told to locate the interview notes.  He said that, once he was instructed to find the notes, he went to his former office to look for them but could not find them.  He testified that he did not destroy or intend to lose the handwritten interview notes.

## C.    Wages[5]

28.     On July 24, 2019, the Shipyard notified Plaintiff that he was not selected for a Shop 17 sheet metal mechanic apprenticeship.  The apprentice program began in August.  From August 1, 2019, to December 6, 2020, Plaintiff kept working at Shop 75—the same Shop Plaintiff worked for since he began his employment at the Shipyard.  In August 2019, Plaintiff's hourly wage was $23.51.  At that time, his pay grade was a WG-5, step 2. Plaintiff received three "step increases" at Shop 75 that raised his hourly wage: in September 2019 (increased to $24.45, WG-5, step 3); in November 2019 (increased to $25.29, WG-5, step 3); and in November 2020 (increased to $25.55, WG-5, step 3).  Step increases are built into the WG scale to compensate an employee for more work experience.  In late 2020, Plaintiff was selected for a general schedule 11 (GS-11) position.  When he transitioned to this new role, on December 6, 2020, his annual wage was $70,120, representing a 32 percent increase in pay compared to his prior position.

29.     Had the Navy selected Plaintiff for a Shop 17 sheet metal mechanic apprenticeship, his hourly wage would have been $23.51 until February 2021.  He also would have been eligible to work overtime hours and "shift differential" hours as an apprentice, depending on availability.  Jenkins testified that shift differential pay compensates employees for

---

[5] Below, the Court concludes that the Navy violated the ADEA when it did not select Plaintiff for a Shop 17 sheet metal mechanic apprenticeship.  These findings of fact on wages address Plaintiff's anticipated earnings had the Navy selected him for the Shop 17 apprenticeship.

working undesirable shifts, such as "swing" and "graveyard" shifts.  Plaintiff credibly testified that if he had been selected for an apprenticeship, he would have worked all overtime and shift differential hours available to him.

30.    At trial, Plaintiff clarified his damages theory.  Plaintiff seeks a back pay award to compensate him for the period between when Plaintiff's apprenticeship would have started, approximately August 1, 2019, until Plaintiff began his higher-paying job on December 6, 2020.

31.    The Navy presented the expert testimony of Erick West, a forensic economist. Plaintiff presented the expert testimony of Dr. Paul Torelli, another forensic economist.  The experts testified about their methodologies in estimating Plaintiff's total lost earnings from Plaintiff's non-selection for an apprenticeship to his retirement date.

*Erick West*

32.    West testified about his methodology in estimating the amount of overtime and shift differential hours that could have been reasonably available to Plaintiff as an apprentice. West reviewed data from the Navy's personnel records to calculate the number of overtime and shift differential hours the Shop 17 sheet metal mechanic apprentices worked between August 1, 2019, until the end of 2021.  West looked at the hours worked by the group of sheet metal mechanic apprentices Shop 17 hired instead of Plaintiff in 2019.  On calculating the number of overtime and shift differential hours worked by Shop 17 sheet metal mechanic apprentices between August 2019 and the end of 2021, the Court finds West to be a reliable expert.

33.    West testified that, between August 1, 2019, and the end of 2019, each sheet metal mechanic apprentice worked an average of 106 overtime hours.  During this period, each sheet metal mechanic apprentice worked an average of six shift differential hours.  For all of 2020, each sheet metal mechanic apprentice worked an average of 126 overtime hours and 25 shift differential hours.

FINDINGS OF FACT & CONCLUSIONS OF LAW - 10

34.     West testified that overtime wages are paid at one and a half times the employee's base hourly wage rate.  He testified that shift differential hours are paid at "25 percent of [the employee's] base hourly rate."  West used both of these multiplier rates (1.5 times and 0.25 times) when he forecasted Plaintiff's damages.

35.     West also considered retirement benefits as part of his overall economic loss analysis.  In doing so, West compared Plaintiff's expected compensation as an apprentice or journeyman (the position directly following the four-year apprentice) to his current role's expected compensation.  West testified that Plaintiff is a member of the Federal Employees Retirement System (FERS), a retirement plan with two components.  First, Plaintiff is entitled to a defined contribution benefit, the Thrift Savings Plan (TSP), which includes up to a five percent match of the worker's base annual wages.  There was no evidence about whether Plaintiff elected to participate in this matching plan.  Second, Plaintiff will receive a monthly pension benefit upon retirement, calculated based on "years of service, a multiple of one percent, and also the highest three-year average of basic pay."  West testified that Plaintiff's retirement benefits for his GS-11 position will be greater than those had Plaintiff worked as a Shop 17 apprenticeship because the GS-11 position pays more and the amount of benefits corresponds to annual wages.  West provided no testimony on calculating retirement benefit contributions on a year-by-year basis.

*Dr. Paul Torelli*[6]

36.     On overtime, Dr. Torelli estimated that Plaintiff would have worked 667 hours of overtime between August 1, 2019, and December 5, 2020.  Dr. Torelli based this figure on a conversation he had with Plaintiff, during which Plaintiff stated that he assumed he would work 500 overtime hours and 100 shift differential hours each year.  Plaintiff testified he provided this "guesstimate" to Dr. Torelli.  The Court finds that Dr. Torelli's forecasting on overtime and shift differential hours is not the product of a reliable methodology.  Rather than estimating based on data provided by the Navy specific to Shop 17 sheet metal mechanic apprentices, or even all apprentices at the Shipyard, Dr. Torelli's calculations derive from a conversation with Plaintiff.  Finding Dr. Torelli not a reliable expert on this issue, the Court credits West's findings for overtime and shift differential hour calculations.

## IV
### CONCLUSIONS OF LAW

Plaintiff asks the Court to find that the Navy has engaged in age discrimination in violation of the ADEA and award back pay, injunctive relief, and attorney fees and costs.

## A.     Age Discrimination

37.     Plaintiff contends that he was not selected for the Shop 17 sheet metal mechanic apprenticeship and the Shop 31 electroplater apprenticeship because of his age.  The ADEA prohibits age discrimination in personnel actions taken by the federal government.  29 U.S.C. § 633a(a).  Personnel actions "include most employment-related decisions, such as appointment, promotion, [and] work assignment." *Babb v. Wilkie*, 140 S. Ct. 1168, 1173 (2020).  To prove his

---

[6] Plaintiff's counsel no longer appears to rely on any of Dr. Torelli's testimony.  During closing arguments, Plaintiff's counsel did not mention Dr. Torelli.  Instead, he cited West's calculations.  Similarly, Plaintiff's post-trial brief and amended proposed findings of fact and conclusions of law do not mention Dr. Torelli or cite any portion of his expert testimony.  Rather, Plaintiff's post-trial filings use West's analysis and calculations.

FINDINGS OF FACT & CONCLUSIONS OF LAW - 12

age discrimination claim, Plaintiff must show that: (1) he suffered an adverse personnel action; (2) he was over 40 years old at the time of the personnel action; and (3) the adverse personnel action was because of his age. *Shelley v. Geren*, 666 F.3d 599, 606–07 (9th Cir. 2012).  The Navy concedes that Plaintiff satisfies the first two elements of his age discrimination claim—he was around 65 years old when the Navy did not select him for an apprenticeship.  The parties dispute causation.

38.     To obtain backpay, a plaintiff must prove by a preponderance of the evidence that "age discrimination was a but-for cause of the employment outcome." *Babb*, 140 S. Ct. at 1177–78.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009).  Plaintiff therefore bears the burden of proving by a preponderance of the evidence that his age was a but-for cause of his non-selection in 2019 as an apprentice for either Shop 17 or Shop 31.[7]

39.     A plaintiff can prove age discrimination through direct or circumstantial evidence. *Gross*, 557 U.S. at 177.  Direct evidence, for an ADEA claim, is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude." *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004) (internal citation and quotation omitted).

40.     The evidence shows that, from the time the Shipyard hired Plaintiff in 2016 until when he applied to the Apprentice Program in 2019, he did not exhibit any performance or

---

[7] The parties' post-trial briefing and amended findings of fact and conclusions of law cite case law that employs the burden-shifting evidentiary framework articulated in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  The Court declines any suggestion to apply that framework here for two reasons.  First, the Supreme Court "has not definitively decided whether the [*McDonnell Douglas*] evidentiary framework . . . utilized in Title VII cases is appropriate in the ADEA context." *Gross*, 557 U.S. at 175 n.2.  Second, "[t]he *McDonnell Douglas* test is used on summary judgment, not at trial." *Shelley*, 666 F.3d at 607 (9th Cir. 2012).  *See Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855 (9th Cir. 2002) ("This legal proof structure is a tool to assist plaintiffs at the summary judgment stage so that they may reach trial . . . [I]t is not normally appropriate to introduce the *McDonnell Douglas* burden-shifting framework to the jury.").

FINDINGS OF FACT & CONCLUSIONS OF LAW - 13

1   behavioral issues.  In fact, he received positive performance ratings and performance-based

2   awards.  Plaintiff was qualified for an apprenticeship, as shown by his name appearing on the

3   Shipyard's list of qualified candidates.  But the Navy contends Plaintiff was not selected by

4   either Shop 17 or Shop 31 because of his interview performance, with a particular focus on his

5   attitude.

6       41.    The Court must evaluate the credibility of the Navy's reason for not selecting

7   Plaintiff—his attitude during each interview.  For an ADEA claim, "it is permissible for the trier

8   of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."

9   *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) (emphasis omitted).  "Proof

10  that the defendant's explanation is unworthy of credence is simply one form of circumstantial

11  evidence that is probative of intentional discrimination, and it may be quite persuasive."  *Id.  See*

12  *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1127 (an "employer's proffered explanation is

13  'unworthy of credence' because it is internally inconsistent or otherwise not believable")

14  (citation omitted).

     *Shop 17*

15

16      42.    After considering all the evidence, while it is a close call, the Court concludes that

17  age was a but-for cause of the Navy's refusal to select Plaintiff for a Shop 17 sheet metal

18  mechanic apprenticeship.  With no surviving notes from Plaintiff's interview, the Court is left to

19  evaluate the testimony and credibility of those who attended the interview to gauge Plaintiff's

20  attitude: the three interviewers (Burton, Malley, and Schneider) and Plaintiff.  The interviewers

21  do not remember any of Plaintiff's answers, and Schneider does not remember the interview at

22  all.

23      43.    First, Burton and Malley testified that Plaintiff's attitude, as evidenced by his

24  "short" and "curt" answers, reflected a lack of interest in the apprenticeship.  The Court finds this

testimony to not be credible.  When Plaintiff applied to the Apprentice Program in 2019, it was his third year in a row that he applied for an apprenticeship position.  Such repeated applications demonstrate his interest.  Burton also testified that he remembered receiving a message from a colleague that Plaintiff was interested in an interview with Shop 17.  Plaintiff testified credibly at trial about his interest in obtaining a sheet metal mechanic apprenticeship, based on his past work experience.  And yet, for the younger applicants selected instead of Plaintiff, Malley and Burton recalled their interest in the program.  Malley testified that Smith, Roberts, and Braun were "very interested," without remembering their answers.  Burton testified that Fair "voiced a lot of interest."

44.     As for the length of Plaintiff's answers, the Court credits Plaintiff's credible testimony that his answers were as long as necessary to adequately respond to the questions posed by the interviewers.

45.     As for other commentary related to attitude, Malley and Burton described Plaintiff's attitude as "negative," "entitled," and "arrogant," without specifying what Plaintiff said or did, other than his "short" answers, to give such an impression.  Again, after considering the credibility of the testimony offered by Plaintiff and the Shop 17 interviewers, the Court finds that Plaintiff's attitude and demeanor during the interview were professional and respectful.

46.     Burton's testimony that an apprenticeship would be a "waste of [Plaintiff's] talents" resembles evidence in other cases in which employers refused to select an older "overqualified" applicant.  Such justifications for not selecting older applicants can conceal an employer's intentional age discrimination.  "Although the ADEA does not prohibit rejection of overqualified job applicants per se, courts have expressed concern that such a practice can function as a proxy for age discrimination if 'overqualification' is not defined in terms of objective criteria." *E.E.O.C. v. Ins. Co. of N. Am.*, 49 F.3d 1418, 1420–21 (9th Cir. 1995).  *See*

*Taggart v. Time Inc.*, 924 F.2d 43, 47 (2d Cir. 1991) ("Denying employment to an older job applicant because he or she has too much experience, training or education is simply to employ a euphemism to mask the real reason for refusal, namely, in the eyes of the employer the applicant is too old.") (reversing summary judgment in employer's favor for ADEA claim); *E.E.O.C. v. D.C., Dep't of Hum. Servs.*, 729 F. Supp. 907, 915 (D.D.C. 1990) (concluding that the term "over qualified" is "almost a buzzword" for "too old").  Further, Burton's opinion that Plaintiff would not be "satisfied" as an apprentice, and the fear that he would be "ostracized" by coworkers, reflects Burton's opinion that Plaintiff—a 65-year-old former naval captain—would not fit in.

47.     As shown below, Plaintiff has also established that Shop 17 treated younger, similarly situated employees more favorably when it selected seven substantially younger employees—Braun, Dejesus, Fair, Gorton, Hops, Roberts, and Smith—instead of Plaintiff for Shop 17's sheet metal mechanic apprenticeship in 2019.  Plaintiff's comparator argument bolsters his position that the stated reason for not selecting him—his attitude—is "unworthy of credence" and pretext for intentional age discrimination.  *Reeves*, 530 U.S. at 147 (2000).

48.     In crafting a comparator argument, a plaintiff submits "evidence that the employer treated younger but otherwise similarly situated employees more favorably than the plaintiff." *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1113 (9th Cir. 2011).  "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).  "The employees need not be identical, but must be similar in material respects." *Earl*, 658 F.3d at 1114.  Plaintiff was similarly situated to the seven employees selected for a Shop 17 sheet metal mechanic apprenticeship because Plaintiff and those selected held similar jobs as recently hired Shipyard employees, and they all were qualified applicants who interviewed for the same apprenticeship.  The Navy does not appear to dispute this.

49.     Burton testified that his criteria for selecting apprentices included a candidate's potential for success, measured by the candidate's highest level of education, their math score on the standardized test, and their work experience.  On these points, Plaintiff's qualifications exceeded those of almost everyone selected for a Shop 17 sheet metal mechanic apprenticeship.

50.     For education level, Plaintiff appears to be the only candidate to have received a bachelor's degree.[8]  Dejesus, Fair, and Roberts have high school degrees.  Fair's high school GPA was 2.783, which Burton testified that he found concerning.  Gorton studied at a community college for around two years.  Hops completed only some college-level course work.  Braun received an associate's degree from Spokane Community College.

51.     For the math section of the standardized test, Plaintiff scored a perfect 300.  The minimum score for the math section was 275.  The seven individuals chosen over Plaintiff scored 272, 275, 276, 279, 286,[9] and 289.  Gorton, whose score of 272 was insufficient, was permitted to retake a separate math test to meet this academic requirement.

52.     As for work experience, Plaintiff had more experience both at the Shipyard and in his career than almost all of those hired over him.[10]  When he applied for the 2019 apprenticeship, Plaintiff had worked in the Shipyard for three years, having held four positions. The only selected candidate who worked at the Shipyard longer was Roberts, who joined the Shipyard in 2015, one year before Plaintiff.  After Plaintiff, Dejesus had the most experience at the Shipyard, having started her employment in 2017 directly after high school graduation.  Fair and Hops worked at the Shipyard for around one year before being hired as apprentices in 2019.

---

[8] Smith may have received a bachelor's degree, but the parties did not provide a copy of her résumé and did not introduce any other evidence about her educational background.
[9] Both Smith and Braun scored 286 on the math section of the standardized test.
[10] There is no evidence about when Smith joined the Shipyard.

FINDINGS OF FACT & CONCLUSIONS OF LAW - 17

Braun and Gorton had worked at the Shipyard for only around three months when they were hired.

53.     Plaintiff's over 30 years of service in the Navy exceeded the work experience of the selected applicants. *See, e.g.*, Ex. 41 (Hops worked at department stores and a pizza restaurant before the Shipyard); Ex. 504 (Braun had prior "heating and cooling" experience and worked at athletic facilities); Ex. 505 (DeJesus worked at a Taco Bell restaurant in high school before her Shipyard employment); Ex. 506 (Fair was a self-employed childcare worker before her Shipyard employment); Ex. 507 (Roberts performed "general helper work" at a carpenter construction company); Ex. 508 (Gorton worked at coffee shops and an automobile dealership before the Shipyard).

54.     Plaintiff was also much older than the candidates offered a Shop 17 sheet metal mechanic apprenticeship.  In 2019, Plaintiff was around 65 years old.  The successful candidates were about 19, 20, 24, 26, 30, 31, and 48 years old.

55.     In sum, the evidence shows that Plaintiff was a qualified employee when he applied for a Shop 17 sheet metal mechanic apprenticeship in 2019.  The Navy's stated reason for not selecting him—his attitude at an interview—does not persuade the Court.  The Court credits Plaintiff's testimony that his attitude and demeanor were professional and respectful during the interview.  Again, while it is a close call, the Court concludes that Plaintiff has established that his age was a but-for cause of his non-selection for a Shop 17 sheet metal mechanic apprenticeship.  Plaintiff has therefore shown that the Navy discriminated against him based on age in violation of the ADEA.

*Shop 31*

56.     On the other hand, the Court concludes that Plaintiff has not shown that age was a but-for cause of the Navy's refusal to select Plaintiff as a Shop 31 apprentice.  The Navy says

that Shop 31 did not select Plaintiff because of his attitude exhibited during the interview. Again, the Court evaluates the testimony and credibility of witnesses at the interview: Jenkins, Candaso, and Plaintiff.

57.     First, both Jenkins and Candaso testified that Plaintiff seemed to be upset that they had not reviewed his résumé before the interview.  Candaso testified that he asked whether Plaintiff had brought a copy of his résumé to the interview.  Candaso found Plaintiff's response—"Are you kidding me? You don't have my résumé?"—to be demeaning.  Jenkins testified that Plaintiff demonstrated he was upset by the interviewers' lack of preparation when Plaintiff commented at one point, "You would know that if you had seen my résumé."  Plaintiff did not dispute that he made these comments.  He stated that he found the interviewers were unprepared for the interview.

58.     Second, both Jenkins and Candaso testified that they were concerned by Plaintiff's answer to the question of what Plaintiff thought his job would be in five years. Although Jenkins and Candaso's recollections differ as to Plaintiff's exact answer, Plaintiff testified that he stated during the interview that he wanted to be Jenkins's boss in five years. Jenkins's testimony corroborated Plaintiff's version of the exchange.  Jenkins found the answer to be "shocking," "off-putting," and it caused Jenkins to question whether he could effectively supervise Plaintiff.  Both Jenkins and Candaso testified that the main reason Plaintiff was not selected was his answer to this question.  Candaso testified that Plaintiff's answer was inappropriate and it "blew [him] away" because of how unrealistic it was to advance that rapidly.

59.     According to Jenkins and Candaso, they agreed to not select Plaintiff because they found his attitude to be concerning.  While Plaintiff disputes that his attitude was inappropriate, and despite the inconsistencies in Jenkins and Candaso's recollections, Plaintiff did not deny that he made the comments relating to the interviewers' preparation and he

concedes that he answered the question about his five-year forecast at the Shipyard in a manner consistent with Jenkins's recollection.  His comments were understandably off-putting and provided a valid basis for his non-selection.  Plaintiff has not shown that Shop 31's reason for not selecting him was false, *Reeves*, 530 U.S. at 147, or otherwise unworthy of credence, *Chuang*, 225 F.3d at 1127.  Plaintiff therefore has not established that his age was a but-for cause of his non-selection for a Shop 31 apprenticeship.[11]

*Additional arguments*

60.      In arguing that the Navy violated the ADEA by refusing to select him for either apprenticeship, Plaintiff points to: (1) evidence suggesting that the Shipyard sought younger candidates for its Apprentice Program; (2) what Plaintiff describes as the Shipyard's arbitrary and subjective hiring practices; (3) evidence about implicit bias; and (4) the Navy's purported spoliation of interview notes.  Because of the above conclusion that the Navy violated the ADEA in not selecting Plaintiff for a Shop 17 apprenticeship based on trial testimony and comparator evidence alone, the Court need not reach these four arguments for the Shop 17 apprenticeship.

61.      As for the Shop 31 apprenticeship, Plaintiff's first three additional arguments do not alter the Court's analysis in answering the determinative question for Plaintiff's ADEA claim: was age a but-for cause of Plaintiff's non-selection for a Shop 31 apprenticeship?

---

[11] The Court acknowledges that the Navy selected four significantly younger candidates for the Shop 31 apprenticeship—aged approximately 22, 25, 28, and 31 in 2019.  But unlike for Shop 17, Plaintiff's qualifications did not necessarily exceed those of the successful younger applicants.  Instead, there were valid, age-neutral reasons for selecting each candidate over Plaintiff.  According to the Navy: Shop 31 interviewers selected Megan Steiner because she had a valuable nuclear qualification, which is "rare to attain," and she came from Shop 38, a group that works closely with Shop 31; they selected Jamie Paylor based in part on a recommendation from an electroplater supervisor; they selected Daniel Hendricks because of strong interview performance, his mechanical background, and prior electroplating experience; and they selected Steven Barr because of strong interview performance and a recommendation from a Shop 31 general foreperson.

FINDINGS OF FACT & CONCLUSIONS OF LAW - 20

62.     First, to suggest that the Shipyard had a profile for younger apprentices, Plaintiff relies on interview notes from other Shop decisionmakers in 2019 and a blog post about the Shipyard's participation at a Women in Trades Fair in 2019.  The notes reflect that interviewers have in the past memorialized age-related information.  *See, e.g.*, Ex. 16 (interviewer wrote that 25-year-old Jacob Sheets was "young and new in [the] shipyard"); Ex. 78 (interviewer wrote that David Turner was "22 years old").  The blog post states that representatives from various Shops attended the event "to show young people" and those "interested in making job changes" the "exciting careers available in various trades."  Neither the notes nor the blog post contains information about Shop 31 apprenticeship interviews or Shop 31 employees or otherwise reflects any nexus to the decision not to select Plaintiff.  The evidence therefore does not make it more likely that Shop 31's interviewers—Jenkins, Candaso, and Bury—refused to select Plaintiff because of his age.

63.     Second, Plaintiff criticizes the Shipyard's apprentice-hiring practices because they were based in part on arbitrary and subjective criteria.  Plaintiff fails to specify which practices he challenges here.  *See* Dkt. # 101 at 14.  In the context of this argument, Plaintiff also contends the Navy did not comply with the federal "merit system principles," codified at 5 U.S.C. § 2301.  These principles mandate that applicants for federal employment "receive fair and equitable treatment" without regard to age, and that "advancement should be determined solely on the basis of relative ability, knowledge, and skills."  *Id.*  Plaintiff says that the Navy violated the merit system principles because the Shipyard's apprenticeship hiring practices overly rely on subjective criteria.

64.     But the "presence of subjective criteria is not *per se* evidence of intentional discrimination."  *Green v. Maricopa Cnty. Cmty. Coll. Sch. Dist.*, 265 F. Supp. 2d 1110, 1125 (D. Ariz. 2003) (citing *Casillas v. United States Navy,* 735 F.2d 338, 345 (9th Cir. 1984)).  *See*

*Jauregui v. City of Glendale*, 852 F.2d 1128, 1135 (9th Cir. 1988) ("The use of subjective factors to evaluate applicants for hire or promotion is not illegal *per se*.").  Instead, district courts should scrutinize an employer's use of subjective criteria, *Casillas*, 735 F.2d at 345, as such criteria can often "be asserted as the reason for an adverse employment decision when, in fact, the reason was discriminatory."  *Nanty v. Barrows Co.*, 660 F.2d 1327, 1334 (9th Cir. 1981), *overruled on other grounds by O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756 (9th Cir. 1996).  The mere fact that the Navy employed subjective criteria during Plaintiff's Shop 31 interview does not warrant concluding that but for his age, Shop 31 would have selected Plaintiff.

65.     Further, the Civil Service Reform Act of 1978 (CSRA), not the ADEA, provides remedies for violating the merit system principles.  "Aside from statutes that expressly create an external remedy—such as Title VII and other anti-discrimination laws—the CSRA 'constitutes *the* remedial regime for federal employment and personnel complaints.'"  *Horsey v. Harris*, 953 F. Supp. 2d 203, 211 (D.D.C. 2013) (quoting *Nyunt v. Chairman, Broad. Bd. Of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009)).  The CSRA protects federal employees against enumerated "prohibited personnel practices," including any action in violation of the "merit system principles" contained in 5 U.S.C. § 2301.  *See* 5 U.S.C. § 2302(b)(12).  "Prohibited personnel practice claims may not be brought directly in district court."  *Horsey*, 953 F. Supp. 2d at 212 (explaining that such claims must be brought first to the Office of Special Counsel, with serious violations appealable to the Merit Systems Protection Board and further review provided in the Courts of Appeals).  To the extent that Plaintiff now challenges the Navy's compliance with the merit system principles, the Court lacks jurisdiction to consider such a claim in the context of this case brought exclusively under the ADEA.  And any claimed violation of the CSRA does not bear on whether Shop 31 did not select Plaintiff because of his age.

66.     Third, Plaintiff says that the Navy did not select him because of the interviewers' implicit bias against older applicants.  The Ninth Circuit has not decided whether evidence of implicit bias aids a plaintiff in proving intentional discrimination.  *See Yu v. Idaho State Univ.*, 15 F.4th 1236, 1244–45 (9th Cir. 2021) ("We decline to address whether implicit bias may be probative or used as evidence of intentional discrimination. . . ."); *see also White v. BNSF Ry. Co.*, 726 F. App'x 603, 604–05 (9th Cir. 2018) (district court declining to give the plaintiff's implicit bias instruction was not an abuse of discretion because the plaintiff "never explained how testimony regarding implicit bias would be helpful to the jury in a disparate treatment case requiring evidence of intentional discrimination").

67.     But in any case, Plaintiff failed to introduce evidence that Jenkins or Candaso, the Shop 31 interviewers, exhibited such a bias.  Instead, Plaintiff's counsel directed a hypothetical scenario at Jenkins and Candaso: assuming they harbored an implicit bias against older workers, was it possible that such a bias impacted their selection?  After denying any implicit bias, Jenkins and Candaso recognized that this hypothetical possibility existed.  This was the only evidence about implicit bias.  Jenkins and Candaso's testimony about hypothetical scenarios does not convince the Court that Shop 31 did not select Plaintiff because of his age.

68.     Fourth, Plaintiff contends that the Navy destroyed its interview notes from Plaintiff's interviews.  Plaintiff seeks an adverse inference that the interview notes contained observations relating to Plaintiff's age and that the notes do not describe any of Plaintiff's conduct that the Navy says disqualified him, such as his "short" answers, his "arrogant" or "petulant" demeanor, or that any of his answers were perceived as deficient or inappropriate.

69.     Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in pending or future litigation."  *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009) (citation omitted).  The district court

has "broad discretionary power to . . . draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993).  Plaintiff must show that: (1) the Shipyard had an obligation to preserve the evidence when it was destroyed; (2) the records were destroyed with a "culpable state of mind"; and (3) the evidence was "relevant" to Plaintiff's claim or defense "such that a reasonable trier of fact could find that it would support that claim or defense." *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012).  The "duty to preserve arises when a party knows or should know that certain evidence is relevant to pending or future litigation." *Surowiec v. Cap. Title Agency, Inc.*, 790 F. Supp. 2d 997, 1005 (D. Ariz. 2011) (citation omitted).  For the second element, district courts may impose spoliation sanctions upon a finding that the party acted with "conscious disregard" of its obligations. *Apple Inc.*, 888 F. Supp. 2d at 998.

70.     Plaintiff does not satisfy the first or second element.  As above, having already concluded that the Navy's non-selection of Plaintiff for the Shop 17 apprenticeship violated the ADEA, the Court focuses on the conduct of the Shop 31 interviewers: Jenkins and Candaso.[12]

71.     Jenkins discarded his interview notes "a day or two" after he and the other interviewers decided to not select Plaintiff.  Jenkins credibly testified that he was never told, as of the July 2019 interview, that he must keep handwritten interview notes.  Plaintiff filed this lawsuit in November 2020.  When Jenkins discarded his interview notes in July 2019, there was no duty to preserve his notes as he was not on notice about future litigation.  Plaintiff also did not show that Jenkins destroyed the notes in "conscious disregard" of the Navy's obligations. Instead, Jenkins was unaware of any requirement to keep the notes.

---

[12] The parties presented no evidence about Bury's conduct with respect to his interview notes.

72.     For Candaso, Plaintiff did not establish any timeline of when the interview notes went missing.  Candaso testified that he kept the notes in a file cabinet, moved offices upon transitioning to a new role at the Shipyard, and he could not locate the notes when instructed to look for them.  But Candaso did not testify about when those events occurred.  Based on the evidence at trial, the Court cannot say that Candaso had a duty to preserve the interview notes whenever they went missing or that his notes were destroyed in "conscious disregard" of the Navy's obligations.  An adverse inference is therefore unwarranted for the interview notes from Plaintiff's Shop 31 interview.

**B.     Remedies**

73.     Because Plaintiff met his burden in showing an ADEA violation in his non-selection for the Shop 17 sheet metal mechanic apprenticeship, he is entitled to relief.

*Back pay*

74.     Under the ADEA, prevailing plaintiffs can recover back pay in the form of unpaid minimum wages or unpaid overtime compensation.  29 U.S.C. § 626(b).  The purpose of back pay under the ADEA is to "restore the employee to the position he or she would have been in absent the discrimination."  *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362 (1995).  *See Howe v. City of Akron*, 801 F.3d 718, 744 (6th Cir. 2015) (the object of a back pay award is to "'make whole' the victim of an unlawful employment practice") (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975)); *see also Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 482–83 (5th Cir. 2007) ("Back pay encompasses what the plaintiff would have received in compensation but for the employer's violation of the ADEA.").

75.     "ADEA plaintiffs must attempt to mitigate their damages. . . ."  *Klein v. Sec'y of Transp., U.S. Dep't of Transp.*, 807 F. Supp. 1517, 1525 (E.D. Wash. 1992).  The amount of a back pay award "must be offset by the plaintiff's actual earnings plus what plaintiff would have

earned if reasonable mitigation efforts had been made." *Id.*  There are two ways to calculate back pay: (1) the periodic mitigation method, and (2) the aggregate mitigation method.  The periodic mitigation method compares the plaintiff's anticipated wages for certain periods (often calendar years) with their actual earnings during those periods.  *Barnett v. PA Consulting Grp., Inc.*, 35 F. Supp. 3d 11, 23 (D.D.C. 2014).  The plaintiff is entitled to back pay for any period in which their anticipated earnings would have exceeded their actual earnings, with no offset for periods in which actual earnings exceeded anticipated earnings.  *Id.*  The aggregate method compares the plaintiff's anticipated earnings with their actual earnings over the entire recovery period.  *Id.  See Wirtz v. Kansas Farm Bureau Servs., Inc.*, 274 F. Supp. 2d 1215, 1218 (D. Kan. 2003) ("If the calculation is performed over the entire time span between termination and trial, it is sometimes termed the 'aggregate' method.").  If the plaintiff's anticipated earnings are inferior to their actual earnings, in the aggregate, the plaintiff cannot recover back pay.  *Barnett*, 35 F. Supp. 3d at 23.

76.     In this case, the choice of method matters.  Plaintiff would not receive a back pay award under the aggregate mitigation method, when the recovery period spans Plaintiff's non-selection in August 2019 until trial, because he began a new job in December 2020 that included a 32 percent increase in pay.  Any lost wages as a Shop 17 apprentice compared to his actual Shop 75 earnings are canceled out by Plaintiff's aggregate financial gains because of his higher annual wage.  But as shown below, Plaintiff's anticipated earnings as a Shop 17 apprentice would have exceeded his actual earnings between August 2019 and December 2020.  Thus, under the periodic mitigation method, Plaintiff would receive back pay for that period.

77.     The Ninth Circuit has not spoken as to which mitigation method to use.  *Cassino v. Reichhold Chemicals, Inc.*, the case the Navy cites, does not endorse a particular mitigation method.  817 F.2d 1338 (9th Cir. 1987).  In describing how ADEA plaintiffs must mitigate

damages, the *Cassino* court stated only that "[a]ny wages the plaintiff actually earned after termination, plus the amount the plaintiff would have earned if [they] had made reasonable efforts, must be subtracted from a backpay award." *Id.* at 1345.

78.     The Court adopts the periodic mitigation method for two reasons.  First, numerous federal  courts have adopted the periodic mitigation method in similar cases.  *Compare Godinet v. Mgmt. & Training Corp.*, 56 F. App'x 865, 872 (10th Cir. 2003) ("Calculating lost wages by the periodic mitigation method is well supported in case law."), *and Darnell v. City of Jasper, Alabama*, 730 F.2d 653, 656–57 (11th Cir. 1984) (applying periodic method under Title VII), *and Skalka v. Fernald Env't Restoration Mgmt. Corp.*, 178 F.3d 414, 426 (6th Cir. 1999) ("We note that Skalka is not entitled to back pay for any period in which he earned an equal or higher salary than he would have earned at FERMCO, but that his 'excess' earnings are not to be subtracted from the back-pay award . . . .") (internal citation omitted), *and Barnett*, 35 F. Supp. 3d at 24 (applying periodic mitigation method in ADEA case), *and Eichenwald v. Krigel's, Inc.*, 908 F. Supp. 1531, 1567 (D. Kan. 1995) (same), *and Hartman v. Duffey*, 8 F. Supp. 2d 1, 16 (D.D.C. 1998) (noting that "periodic mitigation is the preferred method for determining back pay liability in discrimination cases"), *with Graefenhain v. Pabst Brewing Co.*, 870 F.2d 1198, 1213 (7th Cir. 1989) (applying aggregate mitigation method in ADEA action).

79.     Second, the periodic mitigation method fulfills the purpose of ADEA's remedial scheme by compensating plaintiffs for lost wages and "restor[ing] the employee to the position he or she would have been in absent the discrimination." *McKennon*, 513 U.S. at 362.  The alternative approach might improperly encourage employers to delay resolution of a case for as long as possible, "since every day the employee put in on the better paying job [would] reduce [] back pay liability." *NLRB v. Seven-Up Bottling CO. of Miami, Inc.*, 344 U.S. 344, 347 (1953).

1

*Start and end dates*

2      80.      "The first step when calculating back pay is to identify the starting and ending

3  dates for the back-pay award period.  Back-pay calculations begin from the date of the injury."

4  *Howe*, 801 F.3d at 745.  "Although generally the backpay period . . . ends the day of

5  judgment, various factors can affect the determination."  Merrick T. Rossein, *2 Employment*

6  *Discrimination Law and Litigation* § 18.9 (2022 ed.) (collecting authorities).  "Certain events or

7  circumstances may serve to cut off an employee's entitlement to back pay prior to the date of the

8  judgment, such as . . . the plaintiff's employment in a higher-paying job."  *Palasota*, 499 F.3d at

9  486.

10      81.      Plaintiff was injured when the Navy did not select him for a Shop 17 sheet metal

11  mechanic apprenticeship.  The Court finds Plaintiff's back pay start date to be August 1, 2019,

12  the approximate date the Apprentice Program began in 2019 and the back pay starting date

13  employed by the parties' expert witnesses.  And under the periodic mitigation method, the Court

14  finds Plaintiff's back pay end date to be December 6, 2020, the date Plaintiff began his higher-

15  paying job.  *See id.*

16      *Apprentice wages*

17      82.      "Once the district court has selected starting and ending dates for the back-pay

18  award period, the court must calculate the wages [the] plaintiff would have earned had he or she

19  been promoted, before subtracting the wages he or she actually earned without the promotion."

20  *Howe*, 801 F.3d at 746.  In the calculations that follow, the Court presumes, as did West, that

21  Plaintiff worked 40 hours each week.

22

23

24

83.     Accordingly, the Court calculates Plaintiff's earnings had the Navy selected him for a Shop 17 apprenticeship.[13]  As for overtime and shift differential hours, the Court accepts West's methodology for averaging the overtime and shift differential hours worked by the Shop 17 sheet metal mechanic apprentices hired instead of Plaintiff.  To estimate the number of overtime and shift differential hours Plaintiff would have worked as an apprentice, the Court finds it most reasonable to estimate that Plaintiff would have worked the average number of such hours that the Shop 17 sheet metal mechanic apprentices actually worked, as represented in the table below.[14]

| Table 2 | | | | |
|---------|-----------|----------------|----------------|------------------------|
| Period | Shift type | Hours worked | Hourly wage | Total wages for period |
| 08/01/2019 to 12/31/2019 | Regular hours | 864 | $23.51 | $20,312.64 |
| 08/01/2019 to 12/31/2019 | Overtime hours | 106 | $35.27[15] | $3,738.62 |
| 08/01/2019 to 12/31/2019 | Shift differential hours | 6 | $5.88 | $35.28 |
| 1/1/2020 to 12/6/2020 | Regular hours | 1,944 | $23.51 | $45,703.44 |
| 1/1/2020 to 12/6/2020 | Overtime hours | 126 | $35.27 | $4,444.02 |
| 1/1/2020 to 12/6/2020 | Shift differential hours | 25 | $5.88 | $147 |
| Total Shop 17 apprentice wages in 2019 | $24,086.54 | | | |
| Total Shop 17 apprentice wages in 2020 | $50,294.46 | | | |

[13] During his expert testimony, West relied on a set of 20 slides that summarized his calculations and conclusions.  To estimate back pay liability, West compared Plaintiff's actual earnings with his anticipated earnings as a Shop 17 sheet metal mechanic apprentice in 2019 and 2020.  But these slides were not offered  into evidence.  Accordingly, the Court conducts its own calculations for Plaintiff's back pay, considering the admitted evidence and expert testimony.

[14] The Navy emphasizes that overtime and shift differential hours are not guaranteed.  But evidently, the Shop 17 sheet metal mechanic apprentices benefited from available overtime and shift differential hours, as represented by each apprentice averaging over 100 overtime hours for both 2019 and 2020, along with a handful of shift differential hours during those years.  The Navy also suggests that because of an injury in 2017, Plaintiff's physical fitness would have prevented Plaintiff from working extra hours.  The Court disagrees because of Plaintiff's credible testimony that no prior injuries would have interfered with his ability to work additional hours during the period at issue.

[15] As noted above, the hourly overtime wage is one and a half times the employee's base hourly wage rate: $23.51 \times 1.5 = $35.27.  The hourly shift differential wage is calculated at 25 percent of the base hourly wage rate: $23.51 \times 0.25 = $5.88.

*Actual wages*

84.     Next, the Court calculates the wages Plaintiff earned while employed at Shop 75 between August 1, 2019, and December 6, 2020.  These calculations are based on Plaintiff's varied wage rates due to the three step increases Plaintiff earned during this period.

| Table 3 | | | |
|---|---|---|---|
| Period | Position | Hourly wage | Total wages for period |
| 08/01/2019 to 9/14/2019 | WG-5, step 2 | $23.51 | $6,018.56 |
| 9/15/2019 to 11/09/2019 | WG-5, step 3 | $24.45 | $7,824 |
| 11/10/2019 to 12/31/2019 | WG-5, step 3 | $25.29 | $7,485.84 |
| 1/1/2020 to 11/22/2020 | WG-5, step 3 | $25.29 | $47,140.56 |
| 11/23/2020 to 12/6/2020 | WG-5, step 3 | $25.55 | $2,044 |
| Total actual wages in 2019 | | $21,328.40 | |
| Total actual wages in 2020 | | $49,184.56 | |

85.     Based on the above calculations, the Court compares the anticipated wages Plaintiff would have earned as a Shop 17 sheet metal mechanic apprentice with the wages he in fact earned in Shop 75 during the period in question.  *See Howe*, 801 F.3d at 746 (district courts "must calculate the wages [the] plaintiff would have earned had he or she been promoted, before subtracting the wages he or she actually earned without the promotion").

| Table 4 | | | |
|---|---|---|---|
| Year | Apprentice wages | Actual wages | Loss |
| 2019 | $24,086.54 | $21,328.40 | $2,758.14 |
| 2020 | $50,294.46 | $49,184.56 | $1,109.90 |
| Total back pay award | $3,868.04 | | |

86.     As a result, the Court finds that Plaintiff is entitled to an award of back pay damages in the amount of $3,868.

*Retirement benefits*

87.     West testified that Plaintiff is a member of the FERS retirement plan.  "Under the FERS system, the employee contributes a fixed percentage of salary to the fund and becomes eligible for a defined benefit upon . . . retirement based on years of service and salary level."  *In re Sawyers*, 135 B.R. 371, 373 (Bankr. W.D. Mo. 1992).  *See* 5 U.S.C. § 8422(a).  The TSP

component of FERS is an account that a federal agency employer automatically establishes for its employees, and each pay period the employer deposits an "amount equal to 1% of the basic pay [the employee] earn[s] for the pay period." *FERS Information*, U.S. OFF. OF PERS. MGMT. (2023), https://www.opm.gov/retirement-center/fers-information.  A federal employee can make additional contributions to their TSP account, to which the agency will make a matching contribution.  *Id.*

88.    The Navy argues that the Court must reduce any back pay award due to the increased retirement benefits associated with Plaintiff's higher-paying, GS-11 role.  But Plaintiff's back pay award is based on a period that predates Plaintiff starting the GS-11 position. Similarly, West's testimony on this issue is not useful because his calculations are based on the GS-11 position.  The parties offered no evidence on the percentage of Plaintiff's wages that are contributed to the FERS retirement fund or the TSP account after each pay period.  Without the percentage of Plaintiff's earnings that the Shipyard contributes to each fund, or any evidence about Plaintiff's additional TSP contributions, the Court cannot calculate the amount of increased retirement benefits at issue.  And the parties offer no authority, presenting similar facts, to persuade the Court that such retirement benefit contributions should or should not be offset from Plaintiff's back pay award.  Further, any reduction in back pay due to later retirement benefit gains violates the periodic mitigation method.  For these reasons, the Court will not adjust its back pay award because of Plaintiff's retirement benefits.

*Injunctive relief*

89.    The ADEA allows district courts to grant "equitable relief as will effectuate the purposes" of the statute.  29 U.S.C. § 633a(c).  An injunction "is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).  An injunction aims to prevent future unlawful conduct.  *EEOC v. Goodyear Aerospace Corp.*, 813 F.2d 1539,

1543 (9th Cir. 1987).   "An injunction is a matter of equitable discretion; it does not follow from

success on the merits as a matter of course." *Winter*, 555 U.S. at 32.  *See Church of the Holy*

*Light of the Queen v. Holder,* 443 Fed. Appx. 302, 303 (9th Cir. 2011) ("Courts enjoy broad

discretion in fashioning suitable relief and defining the terms of a permanent injunction.").  But

"[t]here are limitations on this discretion; an injunction must be narrowly tailored to give only

the relief to which plaintiffs are entitled." *Orantes–Hernandez v. Thornburgh,* 919 F.2d 549,

558 (9th Cir. 1990) (citation omitted).  *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d

970, 974 (9th Cir. 1991) ("Injunctive relief . . . must be tailored to remedy the specific harm

alleged.").  The district court abuses its discretion in issuing an overbroad injunction.  *Stormans,*

*Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009).  "The necessary determination is that there

exists some cognizable danger of recurrent violation, something more than [a] mere possibility. .

. ." *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953).  The party requesting injunctive

relief has the burden to "satisfy the court that relief is needed." *Id.*

      90.    To obtain a permanent injunction,[16] a plaintiff must have prevailed on the merits,

and must also show that: (1) they suffered an irreparable harm; (2) remedies available at law,

including money damages, are inadequate to compensate that injury which will be ongoing; (3)

the balance of hardships between the parties warrants an injunction; and (4) an injunction is

consistent with the public interest. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 141

---

[16] Plaintiff fails to specify whether he seeks a preliminary or permanent injunction.  Because of the late stage of the proceedings, after a bench trial on the merits in which Plaintiff's singular claim has been adjudicated, the Court construes the requested equitable relief as a permanent injunction.  *See* Charles Alan Wright et al., *Federal Practice and Procedure* § 2941 (3d ed. 2022) (explaining that "[a]ny injunction issued after [the district court] has already decided a claim on the merits must be a permanent injunction"); *Golden Gate Hotel Ass'n v. City & Cnty. of San Francisco*, 836 F. Supp. 707, 709 (N.D. Cal. 1993), *vacated on other grounds*, 18 F.3d 1482 (9th Cir. 1994) ("[I]ssuing a . . . preliminary injunction on plaintiff's first cause of action would be procedurally inappropriate since the court has already decided that claim on the merits.  Any injunction issued on the first cause of action thus must be a permanent injunction. . . .").

(2010).  When the government is the defendant, the last two factors merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  In applying these elements, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction," and cases interpreting the preliminary injunction standard apply "with equal force to . . . permanent injunction cases." *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 996 (9th Cir. 2011) (internal citations omitted).  The Ninth Circuit employs a "sliding scale" approach, meaning that "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

91.     The exact contours of Plaintiff's request for an injunction have lacked clarity throughout this case.  Plaintiff's complaint states that he seeks injunctive relief, without further specification.  During Plaintiff's opening and closing arguments at trial, counsel did not explain what Plaintiff wishes to enjoin.  Plaintiff's post-trial brief describes his proposed injunction, which would: (1) require the Shipyard to "comply with the merit-based, non-discriminatory policies it claims to use"; (2) require the Shipyard to only consider apprenticeship candidates who apply through a public announcement; (3) require the Shipyard to draft new hiring policies based on objective criteria; (4) order the Shipyard to "obey the ADEA"; and (5) require the Shipyard to keep all apprenticeship hiring records, including interview notes.  Dkt. # 101 at 24. In applying the foregoing factors, the Court finds that Plaintiff is not entitled to a permanent injunction.

92.     First, to the extent that Plaintiff seeks an injunction requiring the Shipyard to obey the law, such vague injunctions are disfavored.  *Roman v. MSL Cap., LLC*, 2019 WL 3017765, at *5 (C.D. Cal. July 9, 2019), *aff'd*, 820 F. App'x 592 (9th Cir. 2020) ("'Obey the law' injunctions such as this are disfavored, as they are not narrowly tailored and are at odds Federal Rule of Civil Procedure 65(d), which requires that orders granting injunctive relief be 'specific in terms'

and 'describe in reasonable detail . . . the act or acts sought to be restrained.'") (quoting Fed. R. Civ. P. 65(d)).

93.     As for the scope of the requested equitable relief, the Court views the requested injunction as applying only to the Shipyard and not the entire Navy.  Plaintiff's closing argument and his post-trial brief support this construction.  As for the five components of the proposed injunction, it is unclear whether Plaintiff seeks the Shipyard to change its policies and practices for all positions of employment at the Shipyard or only for the Apprentice Program.  An injunction "must be tailored to remedy the specific harm alleged." *Lamb-Weston*, 941 F.2d at 974.  Throughout this case, Plaintiff has represented that he was challenging the Shipyard's Apprentice Program and not the Shipyard's entire hiring apparatus.  His complaint mentions only the Apprentice Program.  The Court will similarly confine Plaintiff's requested injunction to the Apprentice Program.  The alternative, having the injunction reach non-apprenticeship positions, may render the injunction overbroad.  *See Stormans*, 586 F.3d at 1140 (a district court abuses its discretion in issuing an overbroad injunction); *Church of Holy Light of Queen*, 443 F. App'x at 303 (vacating overbroad injunction "because it reaches beyond the scope of the complaint and enjoins government regulations that were explicitly never challenged or litigated").

### Success on the merits

94.     Plaintiff prevailed on the merits with respect to his ADEA claim involving Shop 17 against the Navy.

### Irreparable harm

95.     Plaintiff contends that irreparable harm is presumed because: (1) the Shipyard violated the ADEA, an anti-discrimination statute; and (2) the ADEA specifically provides for injunctive relief.  Dkt. # 101 at 23–24.  The Court disagrees.

96.     For his first argument, Plaintiff cites *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, in which the Ninth Circuit held that a district court may "presume that the plaintiff has suffered irreparable injury from the fact of the defendant's violation" if the plaintiff establishes that the defendant has violated a "civil rights statute" like the Fair Housing Act.  251 F.3d 814, 827 (9th Cir. 2001).  *See Smallwood v. Nat'l Can Co.*, 583 F.2d 419, 420 (9th Cir. 1978) (irreparable harm requirement for injunctive relief presumed from fact of the defendant's violation of Title VII).  Plaintiff does not cite, nor has the Court found, an instance in which a district court has applied this presumption for a case brought under the ADEA.  And for other civil rights statutes, the Ninth Circuit has not decided whether this presumption applies.  *See, e.g.*, *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1175 (9th Cir. 2010) (noting that it need not decide whether the presumption set forth in *Silver Sage Partners* applies in cases brought under the American with Disabilities Act).  The Court does not conclude that the law requires district courts to presume that a plaintiff suffers irreparable harm from the fact of an ADEA violation.

97.     For his second argument—that irreparable harm is presumed because the ADEA provides for injunctive relief—Plaintiff relies on language from a Ninth Circuit decision over 30 years old, *Burlington N. R.R. Co. v. Dep't of Revenue*: "The standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief."  934 F.2d 1064, 1074 (9th Cir. 1991).  The Court questions whether the presumption endorsed in *Burlington* is still good law because of the Supreme Court's decisions in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) and *Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008).  These two cases disfavor categorical presumptions when adjudicating requests for injunctive relief.

98.     In *eBay*, the Supreme Court rejected the Federal Circuit's "general rule" in patent cases that a "permanent injunction [would] issue once infringement and validity have been adjudged," even if irreparable harm had not been shown. 547 U.S. at 393–94. The Court, in expressing its disapproval of "categorical" rules in injunction cases, held that "well-established principles of equity" required plaintiffs "seeking a permanent injunction [to] satisfy a four-factor test," the first factor being "irreparable injury." *Id.* at 391, 394. The Court cautioned that "a major departure from the long tradition of equity practice should not be lightly implied." *Id.* at 391 (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 320 (1982)). Such a major departure was inappropriate in *eBay* because "[n]othing in the Patent Act indicates that Congress intended such a departure." *Id.* at 391–92.

99.     In *Winter*, the Supreme Court reversed a Ninth Circuit decision that upheld the district court's injunction preventing the Navy from conducting certain training practices "based only on a 'possibility' of irreparable harm." 555 U.S. at 21. The Court ruled that the Ninth Circuit's "possibility" standard was "too lenient": "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22 (emphasis in original).

100.    Since *eBay* and *Winter*, the Ninth Circuit has addressed whether courts may presume irreparable harm in injunction cases. In *Antoninetti*, the Ninth Circuit commented that it once stated that "[t]he standard requirements for equitable relief need not be satisfied when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief." 643 F.3d at 1175 (quoting *Silver Sage Partners*, 251 F.3d at 827). This statement may have been dicta, as the *Antoninetti* panel stated in the same paragraph that it "need not address the question, which the parties vigorously dispute but which the district court did not decide, whether the Disabilities Act authorizes a district court to deny injunctive relief after

finding a violation of the Act." *Id.*  In two later decisions, the Ninth Circuit held that because of the Supreme Court's holdings in *eBay* and *Winter*, "our long-standing precedent finding a plaintiff entitled to a presumption of irreparable harm on a showing of likelihood of success on the merits in a copyright infringement case . . . has been effectively overruled." *Flexible Lifeline Sys.*, 654 F.3d at 998; *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981 (9th Cir. 2011) (same holding).  In *Meyer v. Portfolio Recovery Assocs., LLC*, the Ninth Circuit recognized that presuming irreparable harm was no longer appropriate in copyright cases, but noted: "Our Circuit has not yet determined whether irreparable harm must be shown in order to obtain injunctive relief in all types of cases."  707 F.3d 1036, 1044 (9th Cir. 2012).

101.    Based on these decisions, the Court concludes that presumptions and categorical rules regarding irreparable harm for injunctive relief are strongly disfavored.  *See Perfect 10*, 653 F.3d at 979 ("The use of presumptions or categorical rules in issuing injunctive relief would constitute 'a major departure from the long tradition of equity practice,' and 'should not be lightly implied.'") (quoting *eBay*, 547 U.S. at 388).  The Court must analyze the statute on which Plaintiff brings his claim "to determine whether Congress intended to make 'a major departure from the long tradition of equity practice' and create a statutory presumption or categorical rule for the issuance of injunctive relief." *Id.* at 981 (quoting *eBay*, 547 U.S. at 391).

102.    Plaintiff relies on 29 U.S.C. § 633a(c), which provides that "[a]ny person aggrieved may bring a civil action in any Federal district court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter."  The Court does not read this statute as permitting injunctive relief without a showing of irreparable harm.  The statute mentions no standard concerning injunctive relief.  The Court therefore does not infer that Congress intended to provide for injunctive relief for ADEA plaintiffs without showing

irreparable injury.  Plaintiff must meet all four elements set forth in *Monsanto Co.* to obtain a permanent injunction.

103.    Plaintiff fails to establish that he suffers irreparable injury without a permanent injunction, nor does he identify how the proposed injunction redresses the harm he has suffered. Plaintiff filed this case individually; he is not among a class of apprenticeship candidates who claim age discrimination.  And Plaintiff presented no evidence at trial suggesting that he intends to reapply for the Apprentice Program.  His apparent lack of interest in pursuing an apprenticeship at this point makes sense given his current, higher-paying role.  As noted above, Plaintiff's earnings exceed those of an apprentice by over a 30 percent margin.  Because Plaintiff does not intend to apply again for an apprenticeship, a permanent injunction would not protect Plaintiff from any future harm.  *See W. T. Grant*, 345 U.S. at 633 (explaining that "[t]he necessary determination is that there exists some cognizable danger of recurrent violation"); *see also Goodyear Aerospace*, 813 F.2d at 1543 (holding that an injunction serves to prevent future unlawful conduct).

### *Inadequacy of remedies at law*

104.    Second, Plaintiff does not show how monetary damages are inadequate.  Plaintiff offers merely a conclusory statement that "money damages are inadequate," without further explanation.  Dkt. # 100 at 19–20.  Such a conclusory assertion, with no accompanying evidence, is insufficient for Plaintiff to meet his burden in "satisfy[ing] the court that relief is needed."  *W. T. Grant*, 345 U.S. at 633.  An injunction is inappropriate if other legal remedies are adequate. *See Sampson v. Murray,* 415 U.S. 61, 90 (1974) (holding that the fact that adequate compensatory damages are ultimately available weighs heavily against a claim of "irreparable" harm).  Again, the ADEA's remedial scheme is designed to make plaintiffs whole by "restor[ing] the employee to the position he or she would have been in absent the discrimination."

*McKennon*, 513 U.S. at 362.  A back pay award in this case, which compensates Plaintiff for the higher anticipated earnings he would have received as a Shop 17 apprentice before starting his GS-11 position, puts Plaintiff in the position he would have been had there been no discrimination.

105.    Because Plaintiff fails to meet the first two required elements for a permanent injunction, the Court need not consider whether Plaintiff has established the last two elements set forth in *Monsanto Co.  See Sampson*, 415 U.S. at 88 (explaining that the "basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies").

*Attorney fees and costs*

106.    29 U.S.C. § 633a, which prohibits age discrimination in federal government employment, is the section of the ADEA that governs Plaintiff's claim for relief.  The language of section 633a does not explicitly entitle prevailing federal government employees to an award of attorney fees and costs.  Instead, the subsection dedicated to relief provides, "Any person aggrieved may bring a civil action in any Federal district court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter."  29 U.S.C. § 633a(c).  One district court aptly stated:

> As originally enacted, the ADEA applied only to those workers employed in the private sector.  In 1974, Congress amended the ADEA to protect federal employees from age discrimination.  In so doing, however, Congress failed to incorporate into the amendment the remedial scheme of the ADEA as contained in Section 7 of the Act.  As a result, the ADEA, which allows attorneys' fees to a prevailing private sector employee (Section 7(b) of the Act), contains no explicit reference to an award of attorneys' fees to a prevailing *federal* employee.

*Sterling v. Lehman*, 574 F. Supp. 415, 417 (N.D. Cal. 1983).  The *Sterling* court concluded that "[i]n light of the 'make whole' policy of the ADEA," the federal employee plaintiff was entitled to an award of attorney fees.  *Id.*  Federal district courts have ruled inconsistently on this issue.  *Compare Klein*, 807 F. Supp. at 1526 (prevailing federal government employees may recover

FINDINGS OF FACT & CONCLUSIONS OF LAW - 39

attorney fees), *and Sterling*, 574 F. Supp. at 417 (same), *and DeFries v. Haarhues*, 488 F. Supp. 1037, 1044 (C.D. Ill. 1980) (same), *with Hamilton v. McDonald*, 247 F. Supp. 3d 812, 823 (E.D. Ky. 2017) (prevailing federal government employees may not recover attorney fees), *and Edwards v. Shalala*, 846 F. Supp. 997, 1002 n.8 (N.D. Ga. 1994) ("Though . . . attorney's fees are provided for in the private-action portion of the ADEA, such relief is not available when proceeding against the federal government under § 633a."), *aff'd*, 64 F.3d 601 (11th Cir. 1995).

107.    The Ninth Circuit has not decided whether federal government employees may recover attorney fees against the federal government under the ADEA.  But some other Courts of Appeals seem to agree that such fees are unavailable.  *See, e.g.*, *Hamilton*, 247 F. Supp. 3d at 823 ("Although some district courts have held that public sector plaintiffs may recover attorney's fees under the ADEA, the circuit courts of appeal are uniformly holding that § 633a does not expressly provide for an award of attorney's fees against the federal government and therefore, no such award may be made.") (citation omitted); *Boehms v. Crowell*, 139 F.3d 452, 463 (5th Cir. 1998) ("Simply put, the generalized language of subsection 633a(c)—authorizing 'such legal or equitable relief as will effectuate the purposes of [the ADEA]'—cannot be interpreted as an express authorization of fee-shifting on Congress' part, much less an unequivocal waiver of the government's sovereign immunity vis a vis awards of attorney's fees."); *Nowd v. Rubin*, 76 F.3d 25, 27 (1st Cir. 1996) (affirming district court ruling that the ADEA does not authorize attorney fee awards against the United States); *Lewis v. Fed. Prison Indus., Inc.*, 953 F.2d 1277, 1282 (11th Cir. 1992) ("If Congress had intended to permit claimants to recover attorney's fees in suits against the government under the ADEA, then it had ample opportunity to do so.  In both private sector ADEA and Title VII cases, Congress explicitly authorized attorney's fees.  Its failure to include such provisions in this context compels us to determine that Congress did not intend to provide this remedy for public sector litigants."); *Palmer v. Gen. Servs. Admin.*, 787

F.2d 300, 302 (8th Cir. 1986) (concluding that prevailing federal government employees are not entitled to attorney fee awards under the ADEA because there is no statutory provision expressly authorizing fees and the legislative history is "devoid of the kind of unequivocally expressed intent necessary to authorize an award of fees against the government").

108.    Persuaded by the reasoning outlined by the Courts of Appeals in *Boehms*, *Nowd*, *Lewis*, and *Palmer*, the Court concludes that Plaintiff is not entitled to an award of attorney fees under the ADEA.

109.    Even so, attorney fees and costs might be awardable under the Equal Access to Justice Act, 28 U.S.C. § 2412.  That statute provides that "[u]nless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to . . . costs . . . to the prevailing party in any civil action brought . . . against the United States or any agency or any official of the United States."  28 U.S.C. § 2412(b).  And "[t]he United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." *Id.*  In analogous cases, courts have recognized that prevailing federal government employee plaintiffs could recover fees and costs under the EAJA, but not under the ADEA.  *See, e.g.*, *Lumpkin v. Brown*, 960 F. Supp. 1339, 1354 (N.D. Ill. 1997) (explaining that while the federal government employee plaintiffs were not entitled to attorney fees under the ADEA, they could recover fees under the EAJA, and ordering supplemental briefing).  In *Boehms*, the Fifth Circuit held that the lower court abused its discretion in awarding the plaintiff attorney fees under section 633a of the ADEA but remanded the case after noting "that the EAJA enable trial courts to award attorney's fees against the federal government in ADEA cases."  139 F.3d at 463.  The First Circuit came to the same conclusion in *Nowd*, 76 F.3d at 28.  ("[I]t is entirely consistent with the EAJA's purpose that the United States . . . assume responsibility on a 'completely equal

footing' with private sector employers in regard to attorney fee awards under the ADEA. . . . [T]he EAJA empowers the district courts, in their reasonable discretion, to award prevailing ADEA claimants attorney fees and expenses against the United States.") (internal citations omitted).

110.    Neither side has briefed whether this case satisfies the requirements for an award of attorney fees and costs under the EAJA.  As noted below, the parties are therefore directed to submit briefing on this issue.  The resolution of this question does not impact the finality of the judgment to be entered on the merits in Plaintiff's favor.  *See Budinich v. Becton Dickinson & Co.*, 486 U.S. 196, 199 (1988) ("A question remaining to be decided after an order ending litigation on the merits does not prevent finality if its resolution will not alter the order or moot or revise decisions embodied in the order.").

In sum, based on the above, the Court hereby ORDERS:

1.    The Court AWARDS Plaintiff judgment against the Navy, which shall be entered separately.

2.    The Court AWARDS Plaintiff $3,868 in back pay.

3.    Plaintiff's request for injunctive relief is DENIED.

4.    If Plaintiff continues to seek attorney fees and costs, he must file a motion for them by Thursday, May 4, 2023, noted for Friday, May 19, 2023.  In addition to providing the factual basis for the motion, e.g., the calculation of fees and costs, Plaintiff must address whether he may recover an award of attorney fees and litigation costs under the EAJA.  Defendant must file any response by May 15, 2023.  The opening and response briefs shall not exceed 4,200 words.  Plaintiff must file any reply by May 19, 2023.  The reply shall not exceed 2,100 words.

/

/

Dated this 20th day of April, 2023.

John H. Chun
United States District Judge